25952, Jennifer Vitsaxaki v. Skaneateles Central School District. And Attorney Wagner, did I get that right? It's Vitsaxaki. Vitsaxaki, okay. Much simpler than it looks. I've been googling and trying to figure it out and there wasn't a clear answer anywhere. The floor is yours. Good morning, Vincent Wagner from Alliance Defending Freedom for Jennifer Vitsaxaki, the plaintiff. May it please the court. Schools require parental permission before taking many kinds of actions. New York law requires written parental permission just for students to bring their own sunscreen to use at school. And the school district here requires written parental permission and a doctor's note just to give a student a cough drop. But in Mrs. Vitsaxaki's case, the school district violated this norm of open communication with parents by making a substantially important decision in the life of her 12-year-old daughter. You're merging a bunch of issues, right? One of them is what schools have a permission to do with or without parental consent. And one is the obligations that schools have to inform parents about what is happening in the school grounds, right? I mean, they're not the same thing. That's right. They're separate violations in this case. That's right, Your Honor. The initial violation from the failure to notify Mrs. Vitsaxaki about what was going on in her daughter's life, and then the separate violation of taking the action in her daughter's life without her consent, and then the additional violation of continuing in that course of action while concealing it from her. No, go ahead. That's right. They're separate courses of action by the school district. We argue each is a violation, but they can stand or fall separate from each other. That's right, Your Honor. The examples that you just led with, I'm curious, is it your view that the cough drop policy is constitutionally compelled, or are you just offering that as a policy sort of choice that New York has made that feels intention? In that case, I think it feels intention with what happened here, because of the fact that the school district's norm is communicating with parents. Yet here, it shows to depart from that norm and not communicate with Mrs. Vitsaxaki. Okay, but I'm just trying to understand, because you're here with a constitutional claim, not a this was a bad policy, this is intention with your norm. Is it your view that that norm that you're describing either is compelled by the Constitution, or because there is such a norm, it takes on a constitutional character, or I'm just trying to understand why those analogies tell us anything but constitutional analysis rather than maybe policy arguments. Right, and under both the free exercise clause and the due process clause, there is a constitutional floor for parental involvement in important decisions. And is cough drop notification or consent part of that floor? That's what I'm really getting at. In this case, I don't think the cough drop rises to that level. The school district has chosen that as a policy, but it is part of their policy of informing parents about medical issues. Isn't it the policy of the parents informing the school, rather than the school informing the parents? Like the analogy would be, I gave your kid a cough drop. That would be the analogy, right? Isn't that the better analogy? Well, in this case it requires consent, which the school district also acted without Mrs. Vitsaxaki's consent here. Let me ask a question. If a child was born named Jose Andres, and when they got to school, the kid asked everybody to call them Joe, would the school be obligated to tell the parents that the kid is now choosing to go by Joe? In that case, it sounds like it's not part of a process of social transition like it was here, where it's changing a child's gender marker as part of a social transition during the school day. I'm just asking a question that is what I am hoping that you appreciate we have to do. This is in flux. There are circuit courts all across the country having to deal with this issue. We are in a legal ecosystem in which we have to be aware of what the cases that are coming behind us are going to look like. And so I am asking, if a child was born Jose, and in school says, you know what, call me Joe, would the parental rights be violated if the school chose not to tell the parents? No, I think that sort of nickname is a different scenario than what we have here, Your Honor. And I think part of that is related to the nature of what social transition is, which experts on all sides agree. It's a psychosocial treatment for gender dysphoria. Are all the schools now being subject, are all the teachers now being subject to medical malpractice by choosing to use a name that the kid identifies? I guess maybe the question I should be asking is, what are the limits that parents can, on your position as to what parents can claim are their right to care, custody, and control of the child? Like what is it that can't you ask a school to do in terms of interfering with how the child is being raised? To back up just a little bit from your question to the free exercise issue first, which I think Mahmoud lays down the question of substantial interference with the parents' religious development of their child. So that's the rule under the free exercise clause. And if the storybooks at issue in that case violated the free exercise clause, then Mrs. Witsnacki's allegations of targeted concealment from her, those sorts of things, are certainly enough to state a claim under Mahmoud. Under the due process clause, I think the question becomes one of, again, So if we find that the school policy is actually neutral on religion, then does your position fail? Like if we say they're not taking a stand, that they are responding to a child's preference for sniffing? No, I'm sorry. I mean, just assuming that that's, what happens if we decide that it's not actually interfering with a religious view? To your first question about neutrality, the Supreme Court said in Mahmoud that its ruling there was an exception to the requirement in Smith of general applicability and neutrality. So if you find a burden on the religious development of a child, then that's enough to state a claim under Mahmoud. Okay, and I'm saying imagine a hypothetical if we don't. Like if we do not think that the policy, if we think the policy is not a burden. If you say there's no burden on religion, then we still have the separate due process claim, which I think rises and falls separate from the religion claim here. But it's alleged in the complaint, and I see my time is about to expire. So it's clearly alleged in the complaint that the school district's actions here substantially interfered with Mrs. Mitsaki's religious beliefs. And the school district hasn't contested that in this case. They've made arguments about why... That's correct. It directly violates her religious beliefs. That's the allegation in the complaint. Can I ask, you made an interesting comparison. You talked about a course drop, and you referred to it as medical. All that makes sense. Are we dealing with medical interferences? I mean, there might be a difference between a school's requirement of disclosure of a medical condition as opposed to many other things that schools do. I certainly think the school should disclose medical issues to parents. Do we treat medical issues as different and require a different level of disclosure than the nicknames of the kids who are out to play? Is there a dividing line? I don't think it is a test of whether it's medical or not. I think medical issues are the sorts of important questions that parents need to be involved with. And that's why experts on all sides of this issue recommend parental involvement in questions of whether to socially transition a child. Even WPATH, in its guidelines, recommends that parents be involved. The World Professional Association of Transgender Health. That's fine. And even WPATH, in its guidelines about care for transgender adolescents and children, discusses the need for parental involvement in these sorts of questions. And a well-recognized expert on this issue, Dr. Erica Anderson, weighed in in favor of Mrs. Mitsaki's position as an amicus curiae in this case, discussing the need for parents to be involved in these decisions because a comprehensive mental health assessment of children is necessary to the decision whether to socially transition a child. And that sort of comprehensive assessment isn't possible without parental involvement. All of the cases that are flying around in the briefs, both as to the due process claim and to the First Amendment free expression claim, as far as I can tell, deal with schools either requiring a student to do something or prohibiting a student from doing something. Are there any cases that I can look at that deal with allowing a student but not requiring a student to pursue a potential course of conduct with the cooperation of the school? I think Mahmoud is actually helpful on this because the court addressed and rejected a strict coercion requirement in that case, saying that the free exercise clause protections are broader than a pure coercion test. Whether or not the school is actually requiring a student to... Didn't Mahmoud also say, though, that there was an affirmative endorsement? I mean, and that is what the difference might be? Well, and Mrs. Mitsaki has alleged that in this case, that the school district encouraged and facilitated the social transition here. The school counselor, the school psychologist, the social worker, they held one-on-one and small group meetings with her daughter where they discussed these topics. And her daughter felt compelled to attend these meetings. And the complaint alleges, which has to be taken as true in this appeal, that she ultimately felt pushed by these meetings into this social transition, which is enough to get a passed a motion to dismiss, and we can kind of delve into the merits of that at a later phase of the case. That raises a question for me that I was struggling with a little bit, which has to do with the scope of your constitutional argument. At times, I understand your argument to be focused exclusively on the policy and whether or not execution of the policy as written within the four corners of the policy is unconstitutionally, either facially or as applied in this case. It seems like other times I get snippets of argument that suggest that there's conduct that's not necessarily embedded in the policy, but that's part of the constellation of issues you're challenging. It's policy plus. Could you help me understand whether in evaluating this we're looking solely at the conduct that's authorized by the policy or also conduct that occurred? The way that the complaint alleges the fact is that everything that happened took place pursuant to the policy, and that all of the actions there ultimately, when they came to light for Mrs. Zitzaki and she had meetings with the superintendent, the school board attorney, they endorsed what the school district staff had done as complying with the policy in accordance with the policy. So it's all ultimately attributable to the policy. The policy, but we see the policy, right? We don't have to read it the way you tell us to read it, right? The policy's there. And so if, for example, you're alleging coercion, and I don't see anything in the policy that supports the notion that the policy is inherently coercive, then that suggests to me that there's a part of your claim that perhaps targets conduct by school staff that's not simply the conduct that's called for by the policy. How do I reconcile that? So I think the key here is that there are affirmative allegations that everything school staff did in this case were pursuant to and in accordance with the policy and related custom and practice in the school district. There's a section of our complaint that kind of details the Manelle-related allegations in this case. But it doesn't stop there. It also goes on to the concealment that happened in this case, which clearly is in accordance with the policy. The gender support plan itself, Exhibit 3 to the complaint, Joint Appendix Pitch 78, makes clear that the school district staff, in line with this policy, are going to use this masculine name and gender neutral pronouns during the school day while using the girl's real name when speaking with Mrs. Vitsacky. And it's acknowledged in that plan and in Exhibit 1 to the complaint that Mrs. Vitsacky is unaware of what's going on here. There's a question of whether they affirmatively concealed it rather than did not inform her. And I would think that there's a gap between concealment and failure to inform. Here we have allegations of both, Your Honor. I understand that, but we might have conclusions that are different if they're both. Exactly. And we think that targeted concealment from Mrs. Vitsacky is certainly a violation of her free exercise and due process rights, Your Honor. So, you've got a child. Let's say a child is raised in a reverent Muslim family. It's a female child raised to wear a hijab. It's very important to her family that her head be covered. She gets to school, public school, and she doesn't really want her head covered in gym clothes. So she doesn't wear it. Does the school have an obligation to either prevent the child from making that choice or to inform the parent that the child has done that? I think if the school knows that this is a religious observance of this family, then yes, the school should tell the parents what's going on. And for sure the school shouldn't, if the parents, like Mrs. Vitsacky did in this case, ask questions about their daughter's religious observance at school, conceal what's going on during the school day from them by withholding information. So, for instance, in this case, Mrs. Vitsacky, during this period of concealment of three months, is repeatedly asking questions of school district staff whether they've noticed any changes in her daughter's life. And they consistently told her they hadn't noticed any changes. And it concealed this social transition from her. How is the school to know whose family is close to what religious views? Let me give you another example. A child comes to an observant Catholic family, doesn't consume meat on Fridays during lunch. Obviously if the school compelled the child to eat meat, we'd have, I think, a really interesting case. But if the school maintained a diverse menu and the child orders meat, is the school obliged to say no or to call the parents and get permission or at least notify the parents that the child is making those choices? For sure once the school knows about the family's religious observance, it should make sure the parents are included in that conversation. But it sounds like in the hypothetical the school's not actively engaged in providing, in having the- The child orders the meat and the cafeteria serves it. Here, here you go. Here it is. You have to run to the parents and say, my God, your daughter's son is eating meat on Friday. If the school knows that the family is observant Catholics that don't eat meat on Fridays, then yes, the school should let the parents know and let the parents be the ones making these decisions about- There's some allegations here that the school knew that the parents had the views about gender that had a religious matter that you've described in the complaint. Well, initially Mrs. Vitsacky couldn't make her views known because the whole thing was concealed from her. But once the concealment dropped and the principal revealed everything to her when he was pressured by a teacher to do so, she made her objections known very quickly. And the school district made clear it wasn't going to honor those objections. Let me ask the question a different way. A parent believes in corporal punishment. They think that it's consistent with their religious beliefs. Their kid is acting up in school. The parent says, you know what, smack him. Is the school obligated to do that, to be conforming with religious beliefs? It sounds like in the hypothetical there's no interference with the parent's beliefs because the parents can exercise their religion outside of school, which is not- Why can't they do that at home then? Why can't they call the child whatever they want to call, but the kid can pick the nickname that they choose in school? Because you have a case here like in Mahmood where it's the presentation by authority figures in a child's life of the exact opposite viewpoint that Mrs. Vitsacky is trying to instill in her children. Okay, and if the school says, you know what, I'm not going to hit the kid, I don't think that that's appropriate, I'm not going to do it. That's the exact opposite view of a parent that believes in corporal punishment and thinks that that's the most efficient and godly, divine way of correcting a child's behavior. If the school is telling the child, your parents are wrong, their beliefs are wrong, that's one thing. But if the school is just not participating in the beliefs, that's different. And that's not what we have here. We have the school that's actively engaged in socially transitioning Mrs. Vitsacky's daughter. Can I ask a question another way? Because, again, we're dealing with a legal ecosystem, the law is developing on this. You're a parent whose religious beliefs are divine from John and that we are supposed to love our neighbor as we love ourselves. And their child says, you know, Mom, I want to go by Joe instead of Josephine. And the school, the kid endorses it and they live in a state like Texas. Are their religious rights being burdened? Are you going and protecting the parents in Texas who think that it is consistent with their religious beliefs to be able to go by a different name than what they were assigned at birth? I don't know specifically about the law in Texas, but I will say that ruling for Mrs. Vitsacky would protect all parents, even a family that supports social transition. If a school district is concealing... Can I stop you with the word concealed, please? I'm sorry, but the word concealed is active. Conceal and not inform are two different things. And I want to make sure what you say, concealing, means they are doing something, the school is doing something to make sure or try to ensure that the parents don't know it, rather than having an obligation actively to inform the parent, because I think they may be very different things. I agree that those are different issues, Your Honor, and we have alleged active, targeted concealment. That's what concealment would be.  And that's correct. She was asking for information about her daughter and was told there had been no change during this period when this change was going on. That was the active concealment. That's right, Your Honor. And so if you take the counter-hypothetical of a family that supports this and a school district is actively concealing a social transition from them, say because the school district wants to discourage the social transition, then yes, that would violate those parents' rights under the same principle that protects Mrs. Witsacki, because all parents need to be the ones who are making these sorts of important decisions in their children's lives. Can we ask, or can I ask how you expect us to understand the role of the shocker-conscious standard of life here? This Court has in the past treated that as sort of a pleading matter. So in the Franklin Square case, it said because the parties didn't argue for shocks of conscience to apply, and because the district court didn't apply shocks of conscience, you weren't going to apply it in the Franklin Square case. That's also similar to the approach the Ninth Circuit took in the Regino v. Staley case earlier this year. So because the parties have not argued for application of the test and the district court didn't apply it, I don't... No, no, no, I'm sorry. I just can't explain that. There's at least one member of the court whose conscience is rarely shocked. And so it certainly is a very funny test to try to apply in the real world. Right, and because the parties in the district court have not applied it in this case and have not argued for its application, I don't think that this court at this point needs to apply it. But we do believe that it would be satisfied if the court applied it because of the nature of the parent-school relationship and how that's built on a concept of delegated authority and how the concealment here is inconsistent with that principle of delegated authority from parents to schools. Can I go back to my meet on Friday example for a minute? I guess I understand, A, I guess one question is, does the school have an affirmative duty to reach out to the parents to find out whether they have an objection to their child eating meat on Friday? Is that... Do you have any view on that? As a general rule, I don't think so because that's not the same sort of issue as the kind of gender and sexuality issues that are at stake in this case. Well, I mean, for this family it is. They're very observant and eating meat on Friday would be a violation of their core religious tenets. So I guess part of what I'm trying to figure out is whether issues surrounding gender and honoring a child's wish to be identified using a different name and gender marker is sort of in a class by itself or whether the principles that you're relying on can extend to other circumstances. Now, you said that in the hypothetical that I gave, well, they didn't have an opportunity. They didn't know her views until she made them clear and then they continued thereafter to refer the child to the child they requested. What was the period of time? I think I had it in my head that the child was withdrawn from school very quickly after the notice. Fairly quickly after this came to light, the child was placed in online classes and it was during those online classes where the conduct continued, despite Mrs. Nzaki's instructions, to stop. And so that disregard for her instructions on top of the concealment, on top of the lack of notice, violates both her free exercise rights and her due process rights. So the, I mean, it's interesting. I'm thinking of my colleague's example of Jose Jo. Is it the gender marker that's the issue? I think because it seems like the name would be hard to distinguish from the hypothetical that you sort of dismissed as not something that would implicate the sort of constitutional rights you're invoking. The gender and sexuality issue is clearer in the case of pronouns, but I think it's not out of the picture when it comes to names, too. It's alleged in the complaint that this was a typically masculine name adopted for the purpose of a social gender transition, which is different than the, you know, one of the amici talked about nicknames, and it's different than the practice of using nicknames, that this is a new development in our society, that experts from various backgrounds agree is part of this treatment for gender dysphoria. So if somebody had chosen, if they were named Josephine and they tried to go by Jo, would that have been different, or is it the fact that it was, like, the opposite gender, or a different gender? Given the circumstances here, it was unambiguous that this was part of an attempt to change the whole gender presentation for the child. You know, you have the gender support plan that's attached to the complaint that says, here's the child. What role does the fact that the child led this play, or is at all? I don't think it does play into the analysis here. The Supreme Court in Mahmoud didn't consider whether the kids wanted to read the storybooks it issued, because the question was the parents' religious beliefs, and the religious beliefs that they're trying to instill in their children. It was K and above, for sure, through 5th or 6th grade, but I don't remember exactly where the cutoff was. It could differ, I suppose. In your view, in Mahmoud, if the fact had not been that there was an expectation of instruction on the objected two books, but the books were simply in the library, is it your position that Mahmoud held that a child who goes to the library and asks the librarian to see one of those books wouldn't be able to get that book without first getting parental permission? The Supreme Court specifically reserved that question for a separate case, and I don't think the Court would have to settle it in this case, because of the allegations of encouragement and facilitation here, because of the allegations of targeted concealment from Mrs. Itzhaki. When this was treated as a public fact in the school community, she was the one exception in the school community who didn't know, who was not to be told what was going on in her daughter's life with this gender transition. And those facts separate it from just the hypothetical of a child taking a book off the shelf in the library, which Mahmoud left open. You're conceding that you're not seeking prospective declaratory relief, is that correct? That's correct. We're seeking retrospective declaratory relief. Okay. Can you explain to me why that's a thing? Yeah. The Tenth Circuit has addressed that in a variety of decisions. I think the two most helpful on this topic are one cited in our reply brief, Lippoldt and Collins. Lippoldt is, I believe, L-I-P-P-O-L-D-T, where they talk about, in those cases, they actually held that the plaintiff didn't have standing or was moot, I forget which justiciability doctrine was at stake, as to the prospective claims, but because the plaintiff had retrospective damages claims in those cases... So what's the line between a liability determination on the constitutional claims and retrospective declaratory judgment, as you're asking? No, declaratory judgment goes to the policy itself and ultimately could form... But you're conceding that the appellant has no desire to return to the public school, right? No current plan to, I would say, yeah. If we find that the constitutional claims fail, does that mean the declaratory relief requested here also isn't necessarily good? The constitutional claims are the basis for the declaratory judgment. That's correct, Your Honor. So it's connected with the retrospective constitutional claims for damages. Do we need to decide as a matter of law that pronoun usage is a medical treatment? No, you don't need to decide that, Your Honor. I think it's a substantially important issue, setting aside the question of whether it is medical in some abstract sense, because developing a child's identity as a young woman is the sort of thing that parents should be in the driver's seat for. Irrespective of whether it's medical. That's correct, irrespective of whether it's medical. It's an important issue in a child's life that parents need to be involved in. But I do think it's important to emphasize here that it's clearly alleged from the complaint that this does have long-term health care implications, that there's some evidence to show. I underscored because that I couldn't act as a very useful way to distinguish this case from others who are making the line between medical and non-medical, and they're saying we really can't. This is medical, but it doesn't have to be. I'm saying it doesn't have to meet that test. I think it could because of the health care implications that this course of conduct has. Like I've discussed, experts from a variety of backgrounds have discussed this as a psychosocial treatment for gender dysphoria. There's a growing body of evidence that treating a child as the opposite sex can actually have the effect of locking in gender confusion over the long term. If children aren't transitioned, they're much more likely to become comfortable with their biological sex by the time they become adults. So the decisions taken by the school districts here are important in their own right, but that importance is underscored by their medical implications in this case, Your Honor. Can I ask, though, why isn't the answer for the parent to tell the kid, tell the school, call me by my first name? Well, in this case, the concealment prevented that from happening. Okay. But at some point you say that it happened after it was announced and after they knew. Why is the fix not to tell the parent, for the parent to tell the kid? The answer there is related to Mahmoud's discussion of the Trinity Lutheran line of cases, saying that that's kind of placing a condition on the family's access to the public benefit of a public education. Wait a minute. A parent telling the child, tell the school, call you by your first name, is conditioning active to a school? My understanding of your hypothetical is that if the child chooses to then disobey the parent and tell the school, no, I want to continue this gender transition, then the school is going to continue with its policy here, which would still be a violation of the right we've asserted in this case, because the parent has the right to give consent, which also means the right to withhold consent to the course of conduct here. So the parents need to be the ones that are involved and the ones making decisions on issues like these related to a child's religious development. Was there any reason why your client didn't have access to the district policy manual? The policy itself was available online. So why isn't the answer for parents who have particular views to tell their kid, go by the name that we gave you, tell everybody to go by the name that we gave you? It's related to the argument that Mahmoud rejected, which was essentially that parents who object should put their kids in another education environment. No, it's telling the kid to be, don't avail yourself of an option, right? Consistent with their views, just like the parent that tells the kid, don't pick the pepperoni pizza on Friday, pick the cheese pizza on Friday. And under this policy, the school would not necessarily honor the parent's instructions if the child decided to disregard the parent's instructions. And that's part of the constitutional violation in this case because the school can't override the parental decision. If the parent is deciding to essentially opt the child out of the policy, the school needs to... So you would say that the cafeteria worker cannot give, has to know and cannot give the pepperoni pizza to the kid on Friday? I would say certainly once the cafeteria worker knows, it shouldn't be given. And the school should honor the parent's objection once that objection is known, which didn't happen in this case. The school refused to honor Mrs. Vitsaki's objection. And that's why her daughter was ultimately withdrawn from the district, because it was clear that the school district wasn't going to honor her objection to the policy, which puts it in the category of something like an opt-out, like that which was addressed in Mahmoud. So the school district needs to notify parents and obtain their consent before taking action in a substantially important issue like this, and it certainly needs to not conceal these sorts of issues from parents, which is enough for us to get past the low bar of Rule 12b-6 and get discovery in this case to figure out how this policy is actually being applied and what really happened here. I should tell you that my law clerk, who is most responsible for this case, his or her name is Joe, and I won't tell you what it stands for. And that's related to your colleague's hypothetical earlier in the argument, that that can be ambiguous in cases, but the facts as alleged in this case, it's not ambiguous. It's because it's clear on the paperwork itself that this was part of changing a child's pregnancy. And my law clerk, he wouldn't make it as ambiguous as that. Sorry, I said that about a minute ago. Is there ever a universe? I'm just trying to think, but I understand the concept of social transition as part of a broader treatment approach to diagnose gender dysphoria, but I guess what I want to poke at a little bit is a notion that respecting somebody's request as to how they're identified by name or gender marker only exists as a part of a medical treatment. It sounds as though that's kind of your position, that there's not also space for respecting that request as sort of in the realm of, I think the district court called it sort of civility or civic code, I forget the term. Under the facts of this case, it is clearly part of that process, and I think the various citations that we've given to sources supporting the idea of social transition and what it is and what it is, they regularly talk about names and pronoun usage as kind of a first step in a process. So it can lead to other parts of social transition, but it is... But it also cannot, right? I mean, plenty of kids have a period of time in which they want to be called a different name or want to be used a different gender marker, and then ultimately don't pursue that path, right? I guess that's what I'm sort of puzzling over is whether there's space to understand that request by the child and the infection request by the school as anything other than a sort of medical slash psychological treatment. And it just seems like in the everyday world that we live in, it happens all the time, not in any sort of treatment mode. The potentially transitory nature of what's going on here is actually one of the reasons that a group like WPATH cites for the necessity of involving parents, because parents are likely to have the information to help the professionals in a child's life determine what's really going on here, what's this child really struggling with, because the parent knows the child better than anyone else does, and particularly school staff that are kind of in and out of a child's life year in, year out. And that's why professionals recommend parental involvement and for sure don't recommend social transition without involving parents. You keep using the word transition, and I keep looking at the policy. I don't see transition. I see that the school needs to use the name and how it's going to be communicated to the others. I see that the school needs to maintain the confidentiality of student information and records. I see that when the school wishes to refer to a different name, and I think this gets at the question that my colleague is asking, do we have to medicalize the idea of trying on a different personality and seeing if it fits when children are in their development and growing period? So it's clearly alleged, and like you said, the policy is here, and it talks about changing names and pronouns as part of addressing gender identity questions in a child's life, and whether or not this court finds that that fits the definition of social transition, that's the sort of important question in a child's life that her parents need to be involved in and the ones ultimately making decisions about how to address in her life. So the problem here is that parents are cut out of the picture at the school's discretion whenever the school determines it's not appropriate to involve the parents. I want to push back on the idea. In your view, and part of the reason I think is that there's just a lot of things swimming around. So you don't think the reason that the name is something that is so significant to you and your client is because of gender identity and the important role in gender identity, or because of the interference of religious beliefs? Are you picking a bucket? It's both of those and more, Your Honor. It's violating Mrs. Vitsacky's religious beliefs. It's also the sort of issue— So the kid who was from a big football family decided that they were going to stop playing football, and the parents were convinced that football was the way that the kid was going to get out of poverty. And that was their career, and it comes with a long line of football players. Would the school be obligated to tell the parents that the kid dropped out of football? The school should tell parents that the kid dropped out of football in that case, Your Honor. The baseline is parental communication. But that's not a religious view then, right? So that's what I'm trying to unpack. You would ask us to adopt a view that is separate and apart from religious freedom. It is a robust, freestanding parental involvement obligation, right? And in this case, you alert that you've got two things going on, but you would actually set a rule that says when the kid drops out of drama, if it's important to the parents, the parents need to be told. That's what you're asking us to adopt. I think there's a substantiality component to it. I mean, parents should know what's going on with their kid's classes, but I think the substantiality component is relevant to the constitutional dimension of this case. Issues like severe bullying or violence at school, medical issues like we've been talking about, sex and sexuality, issues like that that we've been talking about, illegal drug use by kids, these are the sorts of issues that are going to be substantially important to all parents. And, for example, in issues of sex- We do know that there are limits on that, right? Like schools are mandated reporters, and if they think that the child is being abused at home, they have an obligation to try and protect the child. That may be active concealment of the fact that the kid has reported it. You would agree with that? In the case of particularized evidence related to a specific child, that would probably satisfy strict scrutiny, which is the test we're arguing for in this case. But there's never been any claim of that here. I'm not saying that there's a claim. I'm trying to figure out what are the limits on what I'm hearing. Is it freestanding, untethered to other fundamental rights, freestanding parental obligation to have a school inform a parent when a child adopts a policy or endeavors a personality at school that may be inconsistent with their values or their preferences? Two things in that, Your Honor. First, we've kind of bracketed the religious claims at this point. I think Mahmoud's helpful at setting some guardrails and that sort of thing on Mrs. Vitsacky's free exercise arguments. But as to the due process clause, that's why we focus in the briefing on history and tradition and argue about why what the school district did here is inconsistent with the traditional understanding of the parent-school relationship. Schools exercise delegated authority in kids' lives, and concealing information from parents and not informing them about important information is inconsistent with that delegated authority. What's the strongest case that you would point to to evidence this recognized tradition of schools having an obligation to tell parents when their kids are doing something that they notably believe to be inconsistent with the parents' values? Separate from the free exercise context? Yes. I think one of the clearest is the Third Circuit's decision in Grinkey v. Seif, which is the case about the swim coach who did not notify parents that he suspected their daughter was pregnant. And a key part of the violation there was that the swim coach made the suspected pregnancy a subject of gossip in the school community, so it's widely known throughout the school community. But he's not disclosing his suspicions to the parents. It's clearly not. That's correct, Your Honor. Pregnancy would clearly fit within the medical bucket. And so that making this substantially important topic of pregnancy an issue that's being widely discussed in the school while not notifying the parents, the Third Circuit faulted the swim coach for in that case. And so that I think addresses a similar sort of violation to what we have at stake here, where you have a widely known fact, the gender support plan on page 78 of the Joint Appendix says that all middle school staff are going to be notified, but not Mrs. Mitsaki, and that's sort of targeted concealment. She wouldn't be notified if the child was pregnant. That's not different. I'm sorry, Your Honor? You're talking about a case that is dealing with a young woman's pregnancy. This is not dealing with anybody's pregnancy, and it starts being quite different. That's all I'm saying. The allegations in the complaint here discuss extensively the health care and medical implications of what the school district has done. That's why I'm asking. So there's the parental rights associated with the free exercise clause, and now you're saying there are parental rights associated with medical care. But you also seem to be saying that there's this other freestanding right for parents to just expect the school to inform them every time a child chooses to engage in a manner that is inconsistent with the parent values. You think that the Third Circuit supports that view. I want to go back then with respect to your parental rights when it constitutes medical assistance. Do we have to then, as I asked earlier, decide that honoring a child's preferences for what they are called in school is medical care? Do we have to decide yes? I don't think you do have to decide yes on that point because I think developing a child's identity, in this case, from being a girl to becoming a young woman, that's the sort of thing that Mrs. Witsaki should be included in and the sort of thing that the school district cut her out of. So that's back to the... Okay, so you're saying that what I think you just said, and I want to make sure that I've got it right because it sounds important to me, that the idea of pronouns is more like the kid dropping out of football or dropping out of drama because it's not medical care. No, I don't think that that's right, Your Honor. So tell me, do we have to find that it's medical care? You don't have to find it's medical care, but the complaint alleges sufficient allegations to beat a motion to dismiss that it has health care implications that are important enough. For instance, the evidence that it increases the odds of long-term persistence of gender dysphoria, that is the sort of thing that parents should be involved in. So I think that crosses the barrier, but I don't think medical care is the only important issue that parents have to be involved in in their children's lives under the 14th Amendment is the distinction I'm drawing. There are other important issues like sex and sexuality, like drug use, bullying. There are probably others, but those are ones that come readily to mind of the sorts of things that parents should be informed of. So let me just, I think you've answered my question right there. If the school had a Gay-Straight Alliance and a child chose to go to the meeting and if the Gay-Straight Alliance was like a teacher or a sponsor, I take it your view would be that the school should, as a matter of due process, inform the parents that the child is opting to go to those meetings because it's, I'm guessing, the proper way forward? Or let me ask you that. Would the school have an obligation to tell the parents the child is going to those meetings? I think so, Your Honor. That's the sort of important question that parents need to be involved in and need to be the ones ultimately making the decision. And it's not unrelated to Mahmoud's discussion of these issues in the free exercise context. So let me ask another question that is related to that. There is a completely different child than your plaintiff. Completely different kid. The parents support the kid's use of a name that is different than what they were born with. School is fine with it. They take the same steps. They honor the wishes of that child. But your client is really upset about that because that is inconsistent with their values. Would your client's religious freedom and her ability to encourage the development of her child consistent with her values be violated? So Mrs. Itzhaki hasn't alleged any belief like that. I'm asking how far you're asking us to extend this policy. So same set of scenario. It's just not her kid. It's somebody else's kid. So her kid is still aware that some kids use different pronouns. Her kid is expected to conform to the norm of civility by calling the kid a different name than what they were born with. Maybe even differently than what they present with. Does your client have a free exercise point because now her child has had her development and growth and exposure interfered with? I see two potential questions there, Your Honor. And the first relates to just the presence of this other child in the school district, which seems analogous in some ways to the hypothetical we discussed a few moments ago about the library books on the shelf, which the Supreme Court has bracketed and seems like a different issue. And then the second question about compelling another student to use different names or pronouns as part of a social transition, I think that presents pretty separate questions about the child's own right to be free from compelled speech. And those issues are ones that are also being litigated in the courts right now. So I think there are a lot of different issues swirling in the hypothetical that make it hard to make an apples-to-apples comparison to this one, Your Honor. But you are not willing to stand here today and say that your client would not have their right to develop their child's growth and spirituality and understanding of gender without impingement because another child made a different choice, or another family made a choice, than different than their client. No, that's a different issue. And I don't think that the court has to reach that question to rule for our client. And that family's own parental rights are at stake there. Ruling for Mrs. Vitsacki protects all parents' rights to be the ones making these decisions for their children. So there's a whole body of rights that are at issue in that hypothetical. So why in that case would you not say that your client doesn't have a right? She doesn't have a right to dictate what those parents do regarding their children. That's right, Your Honor. Does she have a right to say that if the school affirms the child's gender through use of pronouns and whatnot, that that sends a message that's contrary to the message she's trying to raise her child with, and therefore it's not the fact that that other child exists, but the school's response burdens her free religion, free exercise religion? At a point it will become so prescriptive and normative that it would violate the principles of Mahmoud. So it's going to depend on the exact facts. Even if the parent says, even if the parent says, the parent of the child at issue in this case says, this is consistent with my values, I affirmatively endorse it, it is consistent with my religious beliefs, whose rights trump in that case? I'm sorry, I've lost track of which parent we're talking about in the hypothetical, Your Honor. The parent of the child who is choosing to use different means. What I was saying is not that one right trumps the other. It's that there are accommodations that could be made, you know, not participating in the social transition, that sort of thing, that fall short of dictating, one parent dictating another parent's rights. Because the parents need to be the ones making the decisions here, and so the pro-transition family has the right to be the one who's notified and consenting to this, and the one making those decisions, just as much as Mrs. Itzhaki does, even though she holds opposite views from that family. So with the pro-transition family, we'll call them, if the school had a policy that was the flip of this, if the school had a policy that we're only going to use pronouns consistent with sex, assignment, birth, would the school's imposition of that policy, it sounds like in your view, the school would have a due process obligation to comply with the parent's wishes that their child can be affirmed as the child is declared? The question in the affirmation case, there are questions of individual teachers, compelled speech rights, and those sorts of things that I think would have to be addressed in that case, but I do think all parents have the right to be the ones that are notified and consenting to these things, and for sure the school in those cases shouldn't be concealing what's going on during the school day from those parents. My question is, is the due process right that you're asserting for the circumstance presented here, applying the flip side, and I thought you said this was for all parents, but it seems like maybe you're stepping away from that a little bit, and I want to be clear. If the parents said birth certificate notwithstanding my child, this is my child's name, this is my child's gender, would the school have an obligation as a matter of substantive due process, the parent's substantive due process rights, to honor that in how they addressed and dealt with the child in the course of the school? That's right. Parents need to be the ones making these decisions. Yes or no? Yes. Okay. Okay. You sort of put in First Amendment rights, and then I started thinking, well, wait a minute, what about the First Amendment rights of the parents of the two teachers who want to call this kid by the chosen name, chosen gender? I mean, are there First Amendment rights of teachers woven in here that we need to think about? There may be a place where teachers could assert a request for an accommodation, that sort of thing, but that's not addressed on the facts of this complaint as they're alleged here. This is focused on the school district's acting without notifying Mrs. Vitsacky and ultimately engaging in targeted concealment from her of this important information about her child, which is clearly beyond the pale under both the First Amendment and the 14th Amendment. And so if there's no further questions, we ask the Court to reverse and remand for discovery. That seemed longer than seven minutes. You're telling me. All right. Well, we'll hear from you again, and I'm assuming. Thank you, Your Honor. Attorney Scherr. Did I get that right? Scherr? That's correct. Scherr, like Sherman. Oh, okay. Thank you for asking. Wait just one second. It seems like there's a little bit of churn. No problem, Your Honor. Sorry about that. No problem. They don't know what they're going to miss, I'll tell you. Hopefully something good.  I'm sorry, I can't hear you, Your Honor. Certainly not. ...who are involved in this kind of a question and this kind of a counseling need. But the breadth of it was, gosh, my father went to and broke my spirit. It didn't have anything like that. Well, can I have a change to this? Go ahead and launch it. You can respond to that in the context. Happy to do so, Your Honor. May it please the Court, my name is Jeremy Scherr. My pronouns are he and him. I represent the Skaneateles Central School District and school board. I think what's clear from the questions this Court has asked and the answers it's received, that what appellant demands here is a new constitutional mandate of staggering breadth and burden that would be imposed on every single school in this country because it would be a constitutional rule. And that constitutional rule would be the following. If you believe, school, that one of your students is acting in a way that may or may not violate that child's parent's religious views, then the school has an affirmative duty to reach out to the parent and say your child is doing something that may or may not offend you. It doesn't matter if the school even knows what the parent's religious views are. As appellant says in her reply brief, this is a test based on what the school, quote, should have known. Okay, so there's that. There's also, though, if you could take on the argument, once they do know, how is that different? Once the school does know for whatever reason, does the inquiry or analysis change? It does not. And this is why. First of all, this is not a good case to address this issue closely because the question of the school using preferred name and pronouns after Ms. Witsaki said otherwise takes up two paragraphs in the complaint and is offered as a possibility rather than an actual allegation, that there's a belief that the school might continue using the preferred names and pronouns. But to answer your question directly, the Constitution cannot mandate deadnaming and misgendering children. There is no First Amendment precedent or 14th Amendment precedent that requires schools to deadname and misgender children. What about the parents, or what about the school where the kid is named Isaiah and the teachers have a really hard time with that and they decide to call the kid Isaiah? Is that a problem for the parents? It could be a state law violation. It is potentially discriminatory. It could be a federal law violation. It's doubtful that it's a constitutional violation. What we're doing here is talking about whether to constitutionalize what is most a tort, mishandling a child's expression of gender identity. We know from the Descheny case in 1989 that government does not have an affirmative burden under the Constitution to reach out and assist parents with the raising of their children. Is there a difference between reaching out and telling them as opposed to concealing something that the parents want to know? There is a difference, but we have to be very careful about this difference because what appellant calls active concealment really is just not disclosing a fact. There's no allegation here that Mr. Sacky asked the school, is my child going by a different name and pronouns? And the school said no. Then we'd have a different argument. Concealment requires active conduct. It might be different. I'm going to the Foote case for that, the First Circuit's decision in Foote, which dismissed an identical complaint. But that's not ours, right? It is not. But it's a well-reasoned decision. And it's part of a trend in the law, including the Little John case in the Eleventh Circuit. And cases like Grimm in the Fourth Circuit and Doe v. Boyertown School District in the Third Circuit that recognize that these kinds of policies serve extremely compelling state interests because trans kids do better in school when their gender identity is confirmed rather than rejected. And I strongly dispute Appellant's argument that the science is settled on this issue. If anything, it's settled on the side of Appellee's. The Fourth Circuit in Grimm five years ago held that trans kids do not necessarily experience gender dysphoria. It's not the same thing. And that being trans is not an impairment. So you're making arguments that strike me as focused on once we know the test, whether we're doing strict scrutiny on a rational basis, whether or not the test is satisfied, which is helpful. Although we didn't word it that way, my sense is that the focus of our argument thus far has been the question of whether you get strict scrutiny. I agree. Is there a right? So I want to poke at that a little bit.  And I want to poke at it by asking the flip side. And I was talking to your colleague about this at the end. You have a family who is supportive of their child's transition. There is a social transition component to an established plan that may or may not lead to further medical interventions, but it's a plan that's developed in consultation with parents and professionals. And the school has a policy that says we will not gender anybody other than with their sex aside at birth, in terms of how we refer the students. Does that trigger heightened scrutiny under the due process clause? Or is it subject to rational basis review? And if it does trigger heightened scrutiny, how do we distinguish it from this case? So refusing to transition a child vis-à-vis names and pronouns. Yes. We're going to misgender you essentially. It might, because it could be an equal protection violation. Right? But in the matter of due process, that's not a due process violation relative to parents' rights. I don't see it as a due process violation based on this Court's extensive precedence. And Judge Sackey can tell me if I mispronounce the name, but going back to Liebert, I can't tell you. This circuit is repeatedly held that rational basis review applies to a vast variety of questions affecting the administration of schools beyond just teaching. Do you think Liebert is fully intact, yes or no? Yes, it is. Here's why. Because first of all, Liebert is grounded in the due process clause. And Mahmoud is not a due process case. The dissent in Mahmoud explicitly pointed out that the due process clause is never mentioned in the majority opinion. Second, this Court since Liebert has shown great solicitude to the free exercise clause. It has just recently issued a decision imposing an injunction based on a free exercise violation due to lack of neutrality under Smith toward the Vermont Principals Association. And in We the Patriots, the vaccination case, this Court held that free exercise review of actions that impact religious beliefs in schools is alive and well. Now what Mahmoud does here and what it doesn't do is absolutely critical. Right? Mahmoud refers to two cases, Yoder and Barnett, to state that the following is unconstitutional under the free exercise clause. Quote, direct coercive interactions between the state and its young residents, end quote, that substantially interferes with religious upbringing. I'll repeat that. Direct coercive interactions. What's notable about Mahmoud is it expresses that such interactions may be more subtle than blatant types of coercion like saying your religion is wrong or insensitive. But what is stated over and over again in Mahmoud is that there needs to be some kind of, quote, normative, end quote, instruction. Some kind of viewpoint has to be imposed by the school. Okay, well they've got on page 15 of their complaint, paragraph 114 and 115, the school district staff encouraged Jane and her peers in their new gender identity. The social worker started a club, encouraged the same person, encouraged Jane and the others to socially transition. She was getting frustrated with lunches, but she still felt like she could not decline to attend them. We can debate whether or not that was true or not, but how did that not at least come close to the Mahmoud coercion line? Because it's not part of the school's policy. Everyone agrees here that this is a Monell case. And the policy in this case is very clear about what it does and it doesn't do. The policy says that it's up to students to decide when, with whom, and how much to share information about their gender identity. When, with whom, and how much to share. Those are the words that the complaint italicizes in paragraph 200. The policy does not say students should take on new names or pronouns. It doesn't say that they should keep that information from their parents. And it doesn't say that they should attend any kind of club at all. It says that they may choose different names and pronouns if they so desire, and they may choose the level of privacy to impose. And that's what takes this case out of Mahmoud. In fact, that's what takes this case out of all precedent that finds free exercise or due process violations. I want to address something very important that appellant counsel conceded when asked, what's the best case you have that imposes some kind of constitutional disclosure requirement? And the answer was Grunke. Grunke is a Third Circuit case from 2000 in which a swim coach forced a student to take a pregnancy test and spread rumors that this student was pregnant. And while the Third Circuit granted the coach qualified immunity, it found that that could be a constitutional violation because there was coercion. And seven years later, in a case we cite extensively, Ansbach versus the city of Philadelphia, the Third Circuit again looks back at Grunke and says, what made the constitutional violation occur there was the coercion. So the Third Circuit has rejected the argument that appellant makes in this case based on Grunke, that Grunke stands for some sort of freestanding right of parents to mandate that schools disclose information. And that brings me to another critical point. The Constitution does not mandate disclosure of information about children. And if it did, the results would be dystopian. We see that in the hypothetical about eating meat on Fridays. Counsel said, well, that doesn't seem to me to be a sufficient affront to religion to warrant mandatory disclosure. Well, who makes that decision, right? I thought he said that if the school knew about it, they wouldn't need to tell them. Well, in this case, the school didn't. My understanding was, no, that there are different types of religious infractions that may or may not require disclosure. But if I'm incorrect, and I apologize if I am, that may be even worse, because that would make the school have to know somehow what every single religious issue is in the entire district. Okay, but then what happens in the fact pattern that they do know? Because the complaint does say multiple times, you know, that there was an attempt by the mom to try and find out information. If the mom was getting concerned by what she was seeing at home, the mom was asking, is there anything happening at school? Is it different, again, if the school actually knows in terms of your dystopian worry about the birth and so on? No, it's not different. Because if the school knows, well, parents are generally concerned about abortion or pregnancy or sexual preference or being transgender, then under this rule that a parent wants to impose, which, again, is a new rule, the school has to essentially inform on all children who fall within those buckets of religious concern. So if a student says to their counselor at school, hey, I think that I am gay or bisexual or lesbian, and I want help from you, counselor, but I don't want my parents to know, under this rule, because sexual... I think you would concede that. I think the other question is that the person, if the student said, you know, hey, I want to date Jimmy instead of Johnny, and the parents approved of one over the other, they would be obligated to tell the parent. And that is what I think the policy that you're trying to urge us to be cautious of. Right? Because your friend on the other side would say that if it was inconsistent with the religious beliefs of the school knew about it, the parents are obligated to be told as long as... Right. So just, again, to address the heart of this complaint, the argument here is that it's not that the school should have done something differently once it knew. The argument is that the school should have known in the first place. And because being transgender is such a hot-button issue, it has this affirmative need to tell parents whenever there is a desire to use a different name or pronouns. But to use the football example, of course there's no duty to inform under the Constitution. Of course not. There is nothing in this court's precedence, in the Supreme Court precedent, that even suggests that there's such a disclosure requirement. In fact, there's always been a line... What would happen if the parent said, squarely ask the question, is my kid using a different name? Then I would believe under this policy the correct answer is I can't discuss that with you. You think that's what the policy says? Yes, because the policy says the student decides the amount of privacy to assert. But again, we have to look at what this policy... This is an attack on the policy. So we have to look at what the policy says and doesn't say. And the policy does not say the school should lie to parents or the school should deceive parents. In fact, the policy says that the school should try to bring parents in and have them be part of the plan if the student allows it. So the policy encourages parental involvement. It doesn't encourage lying to parents. And as a result, if we say, well, the school's conduct, the individual's conduct, violated the policy, that's not an action under Mornell. There's a Tenth Circuit decision this year, Lee, that dismissed a very similar case on the same grounds. Lee held that efforts to encourage a child to explore their sexuality and gender could not state a Section 1983 violation of any kind because there was no policy from which the conduct sprang. So this just sort of ties into a question I asked your colleague on the other side. Many of the arguments seem like they're challenging the policy as reflected in the four corners of the written document. But they've just made the assertion that the policy also encompasses, as a matter of custom, all of the conduct that is alleged in the complaint that's not necessarily provided for in the four corners of the policy. And I'm thinking in particular about allegations relating to encouraging, and I think there's intimation of coercion. I'm trying to figure out how to reconcile those two views because I do think that the briefing is a little bifurcated on that question. So there is one allegation in the entire complaint that Jane Doe said that she felt pushed. That's the allegation. There are allegations of something like a bumbling attempt by the school to inform Ms. Mitzaki about her child's use of a different name pronoun. Well, and there's lots of paragraphs claiming active encouragement, right? Yes, which are not part of the policy. So that is what Lee says. But my colleague asked, how much is the conduct actually part of the policy? Like when the teachers get into trouble for doing X, Y, and Z, are they going to say, I did it pursuant to policy? Well, plaintiffs made a deliberate decision here not to name any individuals as defendants. And if that had been the case, if individuals had been sued for constitutional violations, they couldn't say they did what they did pursuant to the policy because the policy is silent as to encouragement. It does not say anything about supporting, pushing, making kids do anything. And in that sense, it is consistent with the First Circuit, with the policy that the First Circuit reviewed in foot and which the 11th Circuit reviewed in Littlejohn. And incidentally, we talked about shock to conscience. And if we are talking about individual actors making one-off or individualized decisions, then we are talking about the shock to conscience test. That's what Littlejohn says out of the 11th Circuit. And Littlejohn is an important case regardless of whether we apply that standard because it states so clearly why this sort of policy does not trigger any kind of heightened scrutiny. Can you talk about the retroactive disclosure? Certainly. The Second Circuit has made it abundantly clear. We cited the Markievicz and Dulce cases that a plaintiff cannot seek retrospective declaratory relief in this circuit. There has to be a showing of imminent harm to obtain declaratory relief. Otherwise, it is an advisory opinion. That's federal law in this circuit. And what about the relevance with respect to a liability determination? Any liability determination requires a finding of a violation. If this is a Section 1983 case, an element, of course, of Section 1983 is a constitutional violation. So if this case is not dismissed and there is a verdict for the plaintiff at some point, then there has to be a finding of a constitutional violation. But it's not going to be in the nature of a declaratory judgment. So I'm going to ask the same limits question that I asked your colleague. Certainly, there have to be limits on what is appropriate for a... Certainly, I would think that you would agree that there are going to be some scenarios in which a school should inform the parents about what is happening with their students. What are some of those examples? Well, New York State law is very clear on that. New York State law requires disclosure on health issues. Okay, so if we decide that using names, using different names, is a form of medical care, do you win or lose on those issues? Constitutionally, we win either way. It's not medical care because... And when I talk... Medical care, of course, we say it is. There has to be medical care. I'm saying that there is no constitutional duty to provide or not provide medical care at all. It doesn't matter. But this is not medical care, right? I say my pronouns when I introduce myself. No one here needs to be a doctor to call me by my pronouns. If I were to introduce myself by a unisex name, and that's what counsel means when they say typically masculine. They mean unisex. If I were to introduce myself as Sam or Sidney or Taylor, no one in this room would have to be a doctor to call me those names. And there are countless things that schools do that have health impacts, like deciding how much sleep kids get because the school starts too early or too late. But no one needs to be a doctor to do these things. So, can I go back to the question my colleague asked? I think what you're saying, but I want to make sure I understand this, you invoked the New York statute. The question was, what are the limits? There must be something that the school has to say. You invoked that statute, but I think I hear you now saying that that statute described the statutory obligation, not the constitutional obligation. Yes. So, are there any constitutional obligations? No. There are none. Because this constitution does not require government to assist parents. It does not require government to disclose information. That's a line that the Supreme Court hasn't crossed and that the circuit hasn't crossed. That is purely an area for the people to decide. And I'm going to reference Scrimeti here. Because when we talk about school boards in the abstract, we're talking about the people. We're talking about the democratic process. And Scrimeti says, regardless of what parents may think, regardless of what individual parents may think, we leave decisions about the health of trans and gender nonconforming children to the people. That's the word that the court uses, the people. And their legislatures, their elected officials. So, this court is extremely well aware of the mountain of federal law that governs schools. And the mountain of state law and regulations that govern schools. Schools are enormously regulated as to what they can and can't do. We heard about the cough drop example and we started oral arguments. These are choices that the people make. These are not constitutional mandates. And that brings me back to my original point, which is that we are talking here not about a violation of a state law. In fact, New York state law strongly comes down on the side of the school here. New York public policy comes down strongly on the side of the school here. In a Pellissippi Division 3rd Department case from October 30th, so just about a month ago, called the matter of Kiernan B, the 3rd Department held that the New York state legislature has made the quote determination that transgender individuals face threats to their personal safety that are real, constant, and everywhere. And that includes, quote, hate crimes, harassment, and other discriminations. And we've talked a lot about Mahmoud and opt outs. Parents can't opt out of having transgender children. So I mentioned the mountain of federal law and state law that governs schools in New York. There is no basis for a constitutional mandate that erases the decision-making process that's led to that law, that's led to this policy, a policy that is non-coercive and is strictly permissive. I'm wondering whether you're over-reading Scarametti. I don't remember Scarametti. I thought it specifically reserved the due process question as to whether parental prerogatives relating to the child's medical care could overcome other considerations. I thought they solely resulted in protection. It is, yes, you're right, Your Honor. I do not mean to imply that it was a due process decision. It was an equal protection case. But the conclusion is relevant to our case, right? Because Justice Roberts still concludes that it is up to the people to decide hotly contested issues such as the nature of what is the right kind of health care. Well, that relates to an equal protection claim. I mean, here's what I'm worried about. It seems like you're saying that the school district could adopt, consistent with the Constitution, a policy that did the flip side of this. And I'm wondering whether you really intend to be conceding that, that the school district could adopt a policy of declining to affirm somebody's state agenda. I tried to say before that I think that would in turn raise potentially an equal protection violation. But you don't think it would raise a due process challenge to parents' ability to raise their kids consistent with their parental rights if the parents were behind a plan that included that? I have to admit I'm a bit stumped by that question. I don't think it would. But I don't have that kind of confidence because it's such a different issue. It's such a different issue because it's not an issue of nondisclosure or overruling a parent plaintiff. Well, actually it is. Look, I would say that there likely is a constitutional problem with misgendering and denaming a child and refusing to listen to parents who say, my child's health depends otherwise. But that's an issue for a different day because states have legislated on this. States have legislated on the side of mandated parental consent. And as I stand here today, I'm not ready to argue that those laws are or are not constitutional. All I'm saying today is that there is no constitutional mandate to figure out what parents' religious views are and then affirmatively out children who want to use different names and pronouns to their parents because the children ask the schools to do that. The last point I'll make is that in answer to Judge Seck, I think what Your Honor said earlier about skinny allies, it just shows with the allocation of resources to counseling and support for student gender plans. I don't know if that's true. What I do know is true is that it likely reflects the public policy of New York State, which has come down strongly in favor of policies like appellate. Thank you. Thank you. Appreciate it. Thank you, Your Honor. I'd like to make two quick points about the allegations in the complaint and then a couple points about Mahmoud. So the quick points on the allegations in the complaint. First, my friend in opposition said that it's not clearly alleged that the school district refused to follow Mrs. Vitsacky's instructions, when in fact that's contrary to the allegations in the complaint. That joint appendix, page 29, paragraph 184, it's clearly alleged that Mrs. Vitsacky found out that they were continuing to use the masculine name and gender neutral pronouns after she voiced her objections. That has to be taken as true. Joint appendix 184? Joint appendix 29, paragraph 184, I'm sorry, Your Honor. In addition to that, I'd like to dwell for a second on the active concealment aspect of this. In response to your questions, Judge Sachs, joint appendix pages 21 and 22 are helpful on this and detail particular conversations that Mrs. Vitsacky had with two teachers in particular during this period of concealment where she's asking for information about her daughter and these teachers are participating in what's going on but not revealing what they know is happening during the school day and are actually participating in despite her direct... Can you respond to your colleague's argument that that is not a constitutional problem but rather a policy problem or perhaps a tort? I think it is a constitutional problem because of the, under the Free Exercise Clause, it's an interference with Mrs. Vitsacky's ability to direct the religious upbringing of her daughter. If she doesn't know what's going on with her daughter during the school day, she can't effectively direct the religious upbringing of her daughter. Mahmoud establishes this opt-out right and a parent can't opt their children out of something when they don't know what's going on. The notice element of this case is inherent in the opt-out right that we're asserting under Mahmoud. And surely these allegations of concealment, of refusal to follow her instructions, they beat a motion to dismiss which brings me actually to the Mahmoud point and my friend discussed Mahmoud's discussion of coercion but what's interesting about that is Mahmoud discusses coercion in the context of explaining how the public education context is inherently coercive for children. At some level they're forced to go, teachers exercise incredible influence over children. So the whole environment here is at some level coercive and the facts show that this was more normative and prescriptive than in Mahmoud. And we've specifically alleged at paragraph 162 of the complaint, Your Honor mentioned the allegation about her feeling pushed. I believe my friend in opposition did, paragraph 162. And if Mahmoud said that reading these books to children is enough to state a free, and in fact get a preliminary injunction under the free exercise clause, then the allegations in this complaint are surely enough to beat a motion to dismiss on Mrs. Witsacki's free exercise claim. So we ask this court to reverse and remand for discovery. Thank you, Your Honor. Thank you, Your Honor.